IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LARRY J. BROWN,

                                                            ORDER
                    Plaintiff,

                                                        10-cv-129-bbc
          v.

BELINDA SCHRUBBE, PAUL
SUMNICHT, MICHAEL THURMER
AND CYNTHIA THORPE,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

        Plaintiff Larry Brown, a prisoner at the Waupun Correctional Institution, is

proceeding on claims that defendants Belinda Schrubbe, Paul Sumnicht and Cynthia Thorpe

were deliberately indifferent to his serious medical needs when they withheld various comfort

items he uses to treat his headaches and back and neck pain.  Plaintiff has filed a motion for

preliminary injunctive relief, which the parties have fully briefed.  Also, plaintiff has filed a

motion for a medical examination under Fed. R. Civ. P 35, a motion for appointment of

counsel as well as a motion to certify that he can take an interlocutory appeal from the denial

of his first motion for appointment of counsel.  I will deny each of his motions.

        In responding to plaintiff's motion for preliminary injunctive relief, defendants have

1

filed a motion to revoke plaintiff's imminent danger status.  I will deny this motion as well.

For the sole purpose of deciding plaintiff's motion for a preliminary injunction, I find from the parties' submissions, including plaintiff's medical records, that the following facts are material and undisputed.

MOTION FOR PRELIMINARY INJUNCTIVE RELIEF

A. <u>Undisputed Facts</u>

In August 1984, plaintiff was beaten by a group of fellow inmates at the Waupun Correctional Institution.  (Plaintiff has been incarcerated at the Waupun prison for much of the last 27 years but has been transferred to and from the facility several times.)  Since that time, plaintiff has complained of persistent headaches and musculoskeletal low back and neck pain.

Defendant Paul Sumnicht is a doctor at the Waupun Correctional Institution. Defendant Belinda Schrubbe is the health services manager at the Waupun prison and a registered nurse.

1. <u>Treatment at the University of Wisconsin Hospital Neurology Clinic</u>

From 1985 to 1990, plaintiff was seen several times by Dr. Henry Peters of the University of Wisconsin Hospital Neurology Clinic.  Following a March 19, 1985

appointment, Peters stated, "We continue to see evidence of a greater occipital neuralgia on the right in that pressure over the area reproduces most of his headache." Peters added that he "underst[ood] that physical therapy will be available and he could be considered to be a candidate for some William's exercises." On July 14, 1987, Peters suggested a trial of imipramine to alleviate pain. Following his November 29, 1988 meeting with plaintiff, Peters reiterated his diagnosis of greater occipital neuralgia. Also, he noted, "[Plaintiff] does use a TENS unit [an electrical nerve stimulator] and that should be continued. I do feel that he would benefit from some physical therapy with emphasis on working through Williams' exercises." After plaintiff's final appointment on January 2, 1990, Peters noted that the Pain Clinic had diagnosed plaintiff's tenderness in the back and neck as myofascial pain.

Plaintiff was seen by Doctors David Moore and Jack Rozental of the UW Hospital Neurology Clinic on October 8, 1991. Rozental found plaintiff's symptoms to be consistent with myofascial pain syndrome and chronic daily headaches and noted that these problems were aggravated by the stressors in plaintiff's life. He recommended relaxation techniques, Williams' exercises and use of a TENS unit, as well as an antidepressant and anti-inflammatory medications.

Plaintiff was seen by Doctors Ben Lotz and David Cobasko of the UW Hospital Neurology Clinic on June 13, 1994. Lotz reported that plaintiff had a long history of "musculoskeletal discomfort." (The "musculoskeletal system" comprises the skeleton,

muscles, cartilage, tendons, ligaments, joints and other connective tissue.)  He recommended that plaintiff be placed on Prozac and continue to have access to a TENS unit.

2.  Further treatment

At various times from January 9, 1985 to September 7, 2007, plaintiff received orders for pain medication such as Motrin, Ibuprofen, Tylenol, Naproxen, and Soma as needed for muscle spasms, first tier restrictions, physical therapy, low bunk, extra pillow, extra mattress and a TENS unit.  These items were ordered by DOC medical staff.  X-rays were also taken by order of DOC physicians several times between 1985 and 2003, with at least one of these indicating that plaintiff had degenerative disk disease in the upper cervical spine.

Plaintiff was transferred back to the Waupun Correctional Institution on September 7, 2007, where he is currently incarcerated.  At that time, he had restrictions for low bunk, an extra pillow and an extra mattress.  On October 2, 2007, defendant Dr. Sumnicht met with plaintiff.  Plaintiff stated that he had "what you might call deteriorating disc disease," constant pain, could not bend, and experienced lower back, shoulder and neck pain after sitting for more than 15 minutes.  After examination, Sumnicht found thoracic and lumbar stiffness and slightly increased lumbar lordosis from hip stiffness.  Plaintiff "was evasive" about his medical history.  Also, plaintiff stated that there was no cure for his back pain; only symptom relief with the extra mattress and pillow.  Sumnicht ordered analgesic cream,

4

Excedrine migraine 30 tablets for 6 months, extra pillow for 6 months, low bunk for 6 months, but discontinued the extra mattress.  Sumnicht planned to follow up on plaintiff's complaints of back pain and review his chart.  Plaintiff was upset about the discontinuation of his extra mattress.

Plaintiff was seen again by defendant Sumnicht on October 19, 2007.  Sumnicht noted that plaintiff's complaints of myofascial pain syndrome with fatigue and morning stiffness fit a diagnosis of fibromyalgia.  Plaintiff refused Baclofen, gabapentin and ibuprofen, stating that he was trying to get rid of medications and that he only wanted his extra mattress.  Sumnicht ordered a TENS unit and medications to control the pain.

On October 25, 2007, plaintiff was seen by Health Services Unit nursing staff for complaints of pain with urination.  Plaintiff told the nurse that he was going to (or had) quit taking all medications because the physician refused to give him his extra mattress back.

Plaintiff was seen by family nurse practitioner Gorske on March 5, 2008.  Gorske noted that plaintiff had recently been reclassified to moderate activity by his own request. She noted that defendant Sumnicht had written a diagnosis of fibromyalgia in the chart and that plaintiff had refused treatment for the condition.  Gorske assessed common back pain without radiculopathy. She gave plaintiff a pamphlet on fibromyalgia from the Mayo Clinic and encouraged him to increase his activity to include stretches and walking daily.  Gorske noted that if plaintiff did have fibromyalgia, he should have light activity and that she would

5

change his classification to light activity.  Plaintiff was advised to submit a health service request if he was not improving or if he was getting worse.

On April 1, 2008, plaintiff saw defendant Sumnicht, who noted that plaintiff had a low bunk restriction and extra pillow for the cervical spine degenerative joint disease.  Upon examination, Sumnicht found mild epigastric soreness and noted that plaintiff shrugged his shoulders well. He planned to to follow up with plaintiff and ordered Amitriptyline 50 milligrams for 12 months, Baclofen 10 milligrams for 12 months and an extra pillow for 6 months.

Defendant Sumnicht performed a chart review of plaintiff's medical file on April 2, 2008, to focus on plaintiff's complaints of neck pain, past evaluations and to determine whether more evaluation or more medical restrictions were appropriate.  Sumnicht found that plaintiff's X-rays and head CT scans were normal.  Sumnicht noted that no MRIs were ordered or recommended and that there were no other imaging studies.  The documentation showed that the extra mattress had been primarily prescribed for chronic neural health and myofacial pain.  The degenerative joint disease of the spine was mild.  Sumnicht made a note to consider cervical traction and physical therapy and planned to follow up and to change plaintiff's classification to light duty because heavy lifting worsens myofascial pain syndrome. He noted that plaintiff's classification had been changed to light duty on March 5, 2008. He ordered an extra mattress, extra pillow and low bunk for one year. He also ordered

6

cervical traction, five pounds for ten minutes three times a week for four weeks.  Cervical traction was discontinued after the first session because it caused plaintiff pain.

On May 15, 2008, defendant Sumnicht saw plaintiff for complaints of morning stiffness and daytime pain.  Plaintiff said that the neck injection was no help and that he had back and neck pain after sitting for five minutes.  Sumnicht found that plaintiff had a normal gait, the C-spine X-ray showed degenerative joint disease and the T-spine and L-spine were normal.  Plaintiff's lumbar flexion was poor and hip extension was limited.  Sumnicht noted that plaintiff had decent physical functioning and hand grasp, thoracic lumbar tightness and stiffness and needed range of motion stretching.  Sumnicht made a plan to follow-up with plaintiff.  Sumnicht advised plaintiff on thoracic, lumbar, and hip stretching, with demonstrations of the exercises.  He also ordered an H. pylori test to determine Plaintiff's sensitivity to NSAIDs and continued the analgesic balm and Baclofen.  Sumnicht discontinued the Baclofen and Amitriptyline on May 20, 2008, at plaintiff's request.  However, on June 24, 2008, he continued plaintiff's prescription for aspirin for one year.

On July 3, 2008, plaintiff informed defendant Sumnicht that the stretches helped the mid back and low back pain very little and that his neck was sore.  Sumnicht noted that plaintiff's hand grasp was good and that the mid back pain was better.  Sumnicht advised plaintiff to continue the stretches.  He prescribed Amiriptyline 25 milligrams for one year and ordered a physical therapy evaluation for goals and recommendation on neck stiffness.

The physical therapy evaluation was done on July 18, 2008. Plaintiff requested that further physical therapy treatment wait until he was out of segregation.

Defendant Sumnicht met with plaintiff on September 12, 2008, noting that plaintiff sat comfortably and moved well. Sumnicht assessed myofascial pain. On September 24, 2008, Sumnicht ordered three more physical therapy visits for plaintiff's neck and a TENS unit for his neck for 12 months.

Plaintiff went back to physical therapy on September 29, 2008. He told the therapist, "To be honest, I don't think anything is going to help my pain until the stress is gone." Plaintiff was instructed on cervical range of motion exercises. He was given a TENS unit on October 1, 2008. On October 8, 2008, plaintiff had another physical therapy appointment. Plaintiff refused further physical therapy, stating that he had the TENS unit and thought it was working.

Defendant Sumnicht discontinued the order for Amitriptyline on November 3, 2008 after plaintiff said he no longer needed it. On November 5, 2008, plaintiff was seen by HSU nursing staff. He informed staff that he was out of patches for the TENS unit and that they had been ordered but had not received them yet. He stated also that he needed another set of electrodes with wires for the TENS unit. The nurse noted that wires for the TENS unit were found and issued to plaintiff and that she would order more patches and dispense them to plaintiff upon receipt.

8

During an exam on December 17, 2008, plaintiff informed defendant Sumnicht that the TENS unit worked very well on his back pain.  Sumnicht made a plan to follow up with plaintiff on his complaints of aches and fatigue.  On April 10, 2009, Sumnicht renewed plaintiff's restriction for low bunk, an extra pillow and an extra mattress for 6 months.

Plaintiff's prescription for aspirin was renewed for one year on June 5, 2009.  Plaintiff was seen by HSU nursing staff on July 20, 2009, for complaints of back discomfort.  The nurse noted that he had special needs restrictions and that he had a current order for an extra mattress.  Plaintiff claimed that his mattress was hard. The nurse spoke with Sgt. Hilbert, who stated that he would attempt to replace the mattress.

Plaintiff's order for low bunk, extra mattress and extra pillow restriction expired on October 4, 2009.  This order was not renewed.  Defendant Sumnicht did not believe that plaintiff had a medical need for any of these items.  The Special Needs Committee, which consists of defendant Belinda Schrubbe and Lt. Braemer, reviewed the medical chart for conditions that met the guideline requirements for special needs and determined that plaintiff did not meet the criteria for the low bunk, extra pillow and extra mattress. Plaintiff's order for comfort items had expired and they saw no medical need to renew them. Plaintiff's order for the TENS unit was not discontinued.

On October 26, 2009, defendant Sumnicht met with plaintiff.  Sumnicht noted that plaintiff's restrictions had expired, that the "1985 trauma" remains and that plaintiff was

9

refusing pain medication.  It was further noted that plaintiff was sitting comfortably in chairs, nodding his head and was moving his arms.

Plaintiff was seen by HSU nursing staff on November 16, 2009.  Plaintiff said he had stopped taking his medications because he was frustrated that he was getting no medical attention.  After the exam, the nurse made a plan for plaintiff to take medications for chronic conditions.  She noted that if plaintiff wanted comfort items when he was released from segregation, he could earn money and pay for them himself.

Defendant Sumnicht made a plan on December 9, 2009, to follow up with plaintiff's neck pain.  On December 25, 2009, plaintiff was seen by HSU nursing staff for complaints of dizziness and back pain.  The nurse noted that he was alert and responsive.  Plaintiff stated he was on pain medication and that he had already taken them that day.  The nurse took plaintiff's vital signs.  Plaintiff sat with the nurse for approximately 15 minutes.

Plaintiff was seen by defendant Sumnicht for his complaints on January 4, 2010. Plaintiff told Sumnicht that all providers said that he had musculoskeletal and degenerative disc disease.  Sumnicht noted that plaintiff had no problems in his arms, had good hand grasp and got dressed "ok."  Plaintiff moved his neck well and walked well.  Sumnicht assessed fibromyalgia and made a plan to get X-rays of plaintiff's C-spine and L-spine.

On January 6, 2010, defendant Sumnicht performed a chart review on plaintiff's request to find out the specific diagnosis for his "musculoskeletal conditions."  Upon review,

10

Sumnicht found no evidence of neurologic injury and observed that plaintiff's complaints seemed out of proportion to examination findings. Sumnicht noted that plaintiff had 12 evaluations for headache and neck pain in 1985. A neurology evaluation on June 13, 1994 for chronic headache had findings of a musculoskeletal origin rather than neurologic. The report following a January 2, 1990 neurology appointment called the pain myofascial pain. A CT scan on March 29, 1988 of plaintiff's head was normal. Sumnicht assessed "myofascial pain triggered neck and low back pain" and made a plan for no change in treatment.

The x-rays defendant Sumnicht ordered were taken on January 25, 2010. The radiologist's reading of the C-spine and L-spine X-rays showed no abnormalities or misalignments. The X-rays of the neck did not reveal any degenerative disk disease.

Defendant Sumnicht met with plaintiff on February 22, 2010 to discuss plaintiff's complaints of "musculoskeletal injuries." Plaintiff stated that he had not had an examination by a neurologist for the cause of his pain. Sumnicht noted that plaintiff sat well and had good hand grasp. Plaintiff's other previous labs were normal and Sumnicht assessed no sign of neurologic disease except a left exotropia and myofacial pain. The old chart was reviewed and plaintiff was prescribed Amitrypline 50 milligrams.

Plaintiff was seen for various medical complaints and conditions approximately 55 times while confined at the Waupun prison between September 7, 2007 and June 18, 2010.

11

3. Tinted glasses/single cell

On December 4, 1985, plaintiff told the optometrist that he wanted the lenses of his glasses tinted and that he was willing to pay for them.  The optometrist found no medical need for the tinted lenses so the tinted lenses were ordered at plaintiff's expense.  On August 12, 1992, plaintiff wrote to Mary Janssen about getting an order to continue to wear the tinted lens glasses.  Plaintiff stated in his letter that in 1984 the Health Services Unit allowed him to use the prescription to buy his own personal prescription sunglasses at a time when there was no policy or procedures stating an inmate must have something wrong with his eyes to wear such glasses. Plaintiff further stated that from 1984 to 1992, he had worn the glasses and his eyes had become sensitive to light, even though he did not have this problem when he first bought the glasses.  On August 17, 1992, Health Services wrote a memorandum to security, saying that plaintiff could have his prescription #2 rose colored glasses indefinitely.

Plaintiff complained of photophobia (excessive sensitivity to light) to the optometrist on April 18, 2002 and requested medical clearance to be placed in a single cell so that he could control the lighting all the time.  Plaintiff reiterated his request for single cell placement to Dr. Cannon in a letter dated July 16, 2002.  On September 11, 2002, plaintiff was seen by psychologist John Grammer in the Health Service Unit at Whiteville Correctional Facility to discuss his need for a single cell.  Plaintiff said that he needed a single

12

cell because both he and his cellmate had so much legal work, there was not enough room. Plaintiff stated that "I am frustrated and I file lawsuits when I am frustrated."

On March 26, 2003, the optometrist found that plaintiff's cornea, pupil and retina color were all within normal limits, giving no medical reason for dark tinted glasses at that time. The optometrist noted that plaintiff may have light sensitivity because he continually wore a dark tint indoors, so that he had a sensitivity to light when he removes the glasses. He added this was normal and that without the glasses plaintiff's eyes would adjust. Plaintiff was seen on March 21, 2005 by optometrist Dr. Richter. After examination, Richter documented "no medical indication for tinted glasses."

On December 19, 2007, plaintiff met with psychiatrist Todd Callister and told him that he was upset about clinical services turning down his request for a single cell and that he believed the prison system "owes it to me." Callister noted that plaintiff was focused on obtaining a single cell.

4. Inmate grievance regarding extra mattress

Defendant Cynthia Thorpe has been employed by the Wisconsin Department of Corrections as Health Services Nursing Coordinator since February 25, 2001. Thorpe does not participate in decisions regarding specific medical treatments. These decisions are made by the health services staff within each institution. Plaintiff filed offender complaint

13

WCI-2009-22156, which was received on October 5, 2009, complaining that the Special Needs Committee had denied his extra mattress on September 28, 2009. James Muenchow, the institution complaint examiner at the Waupun prison, conducted an investigation. He talked with defendant Schrubbe, the health services unit manager, who informed him that the Special Needs Committee had met and determined that plaintiff did not qualify for an extra mattress, citing the criteria in the Bureau of Health Services Policy and Procedure 300:07. Muenchow recommended dismissal of plaintiff's complaint, stating that no determination would be made with respect to plaintiff's claim because Muenchow brought "no particular expertise to the task of evaluating treatment protocol or whether a specific condition qualifies for a specific type of treatment, and how the Committee used that information to reach its decision." On November 10, 2009, acting as a reviewing authority within the inmate complaint review system, Thorpe reviewed Muenchow's findings and noted that "the physician ultimately determines this need." Thorpe followed Muenchow 's recommendation and dismissed the offender complaint.

## B. Discussion

As an initial matter, I note that plaintiff has filed a motion for extension of time to respond to defendants' proposed findings of fact. He states that he recently "finished a summary judgment motion" in an Eastern District of Wisconsin case, and now realizes that

he should respond to defendants' proposed findings of fact in this case.  I will deny this motion because under this court's <u>Procedure to be Followed on Motions for Injunctive Relief</u>, which plaintiff received along with the May 20, 2010 screening order, the moving party does not have an opportunity to file materials in reply.

Moving on to the merits of the motion, I note that "the granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." <u>Roland Machinery Co. v. Dresser Industries</u>, 749 F.2d 380, 389 (7th Cir. 1984).  The standard applied to determine whether a plaintiff is entitled to preliminary injunctive relief is well established:

> A district court must consider four factors in deciding whether a preliminary injunction should be granted.  These factors are: 1) whether the plaintiff has a reasonable likelihood of success on the merits; 2) whether the plaintiff will have an adequate remedy at law or will be irreparably harmed if the injunction does not issue; 3) whether the threatened injury to the plaintiff outweighs the threatened harm an injunction may inflict on defendant; and 4) whether the granting of a preliminary injunction will disserve the public interest.

<u>Pelfresne v. Village of Williams Bay</u>, 865 F.2d 877, 883 (7th Cir. 1989).  At the threshold, plaintiff must show some likelihood of success on the merits and the probability that irreparable harm will result if the requested relief is denied.  If plaintiff makes both showings, the court then moves on to balance the relative harms and public interest, considering all four factors under a "sliding scale" approach.  <u>In re Forty-Eight Insulations, Inc.</u>, 115 F.3d 1294, 1300 (7th Cir. 1997).  Thus, to obtain a preliminary injunction, a movant must first

prove that his claim has "at least some merit." Digrugilliers v. Consolidated City of Indianapolis, 506 F.3d 612, 618 (7th Cir. 2007) (citing Cavel International, Inc. v. Madigan, 500 F.3d 544, 547 (7th Cir. 2007)).

After considering the parties' submissions regarding plaintiff's motion for a preliminary injunction, I am persuaded that plaintiff has failed to show some likelihood of success on the merits of his § 1983 claim.   Under the Eighth Amendment, a prison official may violate a prisoner's right to medical care if the official is "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).  A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person.  Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006).  A medical need may be serious if it "significantly affects an individual's daily activities," Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998), if it causes pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).

"Deliberate indifference" means that prison officials know of and disregard an excessive risk to inmate health and safety.  Farmer, 511 U.S. at 837.  Inadvertent error, negligence, gross negligence and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment.  Vance v. Peters, 97 F.3d 987, 992 (7th Cir. 1996); Snipes v. DeTella, 95 F.3d 586, 590-91 (7th Cir. 1996).  Thus, disagreement with

16

a doctor's medical judgment, incorrect diagnosis or improper treatment resulting from negligence is insufficient to state an Eighth Amendment claim.  Gutierrez v. Peters, 111 F.3d 1364, 1374 (7th Cir. 1997); Estate of Cole by Pardue v. Fromm, 94 F.3d 254, 261 (7th Cir. 1996).  Instead, "deliberate indifference may be inferred [from] a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  Estate of Cole, 94 F.3d at 261-62.

Plaintiff's main argument is that starting with Dr. Peters and continuing for the next 25 years, all of his doctors have agreed that he has "musculoskeletal injuries" and degenerative disc disease and have prescribed him a TENS unit, dark prescription glasses for headache abatement, a medical single cell, physical therapy, extra mattress, extra pillow, lower bunk, medications and regular visits to a neurologist for new treatments.  Plaintiff reasons that because his doctors have unanimously agreed about his diagnosis and treatment with various comfort items, defendants' decisions to take away some of these items shows that they were deliberately indifferent to his medical needs.  This argument fails for several reasons.

First, plaintiff fails to produce facts supporting many aspects of his claims.  For instance, plaintiff fails to point to any record of his having been prescribed a medical single

17

cell, and the record indicates that he has not had regular appointments with a neurologist since 1990.  In addition, the record shows that although plaintiff was allowed to wear tinted glasses in the past, they were never prescribed for medical reasons, and optometrists concluded that he had no medical reason to wear them.  Also, it seems that plaintiff has chosen to forgo some treatment for his ailments, including physical therapy.

Moreover, plaintiff fails to show that defendants Schrubbe and Thorpe can be held liable under the Eighth Amendment for their actions.  The record shows that when Schrubbe reviewed plaintiff's medical restriction decision, she did so in her role on the Special Needs Committee, which reviews such decisions and that she relied on defendant Sumnicht's evaluation that plaintiff had no medical need for a low bunk, extra mattress and extra pillow.  Also, it is undisputed that Thorpe relied on Sumnichts's evaluation in denying plaintiff's inmate grievance.   These defendants are entitled to rely on defendant Sumnicht's professional medical opinions.  <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1015 (7th Cir. 2006).

Next, judging from the medical records submitted by the parties, it appears that plaintiff greatly exaggerates his characterization of his previous doctors' opinions as unanimous.  It is far from clear that Dr. Peters and the other treating doctors all agreed on the precise medical condition allegedly afflicting plaintiff.  Plaintiff calls his maladies "musculoskeletal injuries," but "musculoskeletal" is a very broad term encompassing a person's bones, muscles and connective tissue.  Dr. Peters diagnosed greater occipital

18

neuralgia.  Also, he noted that the UW pain clinic characterized plaintiff's tenderness in the back and neck as myofascial pain.  Dr. Rozental diagnosed myofascial pain syndrome and chronic daily headaches aggravated by the stressors in plaintiff's life.  Dr. Lotz reported only that plaintiff had a long history of "musculoskeletal discomfort."  Plaintiff fails to show what diagnoses he heard from DOC doctors before Sumnicht reviewed his condition.  Sumnicht examined plaintiff several times, diagnosing fibromyalgia and myofascial pain.  Regarding the diagnosis of degenerative disc disease, x-rays taken in 2003 indicated that plaintiff had degenerative disc disease.  However, in 2008, defendant Sumnicht reviewed plaintiff's records and considered the disease to be mild; in 2010, a new set of X-rays failed to show signs of degenerative disc disease.

The medical records do not support plaintiff's assertion that all of these doctors treated him by prescribing the same comfort items.  In particular, he exaggerates the treatment suggested by the UW doctors.  Peters seems to have prescribed a TENS unit, physical therapy, Williams' exercises and medication.  Dr. Rozental prescribed relaxation techniques, Williams' exercises, a TENS unit, an antidepressant and anti-inflammatory medications.  Dr. Lotz prescribed Prozac and a TENS unit.  The records do not show that the UW doctors prescribed an extra mattress, dark glasses, extra pillow, medical single cell, lower bunk or regular neurological appointments, as plaintiff alleges.  Plaintiff's exaggerations undercut his argument that all of his outside medical sources agreed upon the course of

19

treatment.

Finally, and most important, plaintiff cannot prevail in this case merely by showing that defendant Sumnicht's diagnoses and treatment decisions differed from those of previous medical staff's. "[M]ere differences of opinion among medical personnel regarding a patient's appropriate treatment do not give rise to deliberate indifference." Estate of Cole, 94 F.3d at 261. Instead, "deliberate indifference may be inferred [from] a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." Estate of Cole, 94 F.3d at 261-62.

The facts submitted by the parties indicate that Sumnicht or other medical staff have met with plaintiff 55 times over the last three years. The medical records provide detailed reports showing that defendant Sumnicht has examined plaintiff at length and has found no medical need for a low bunk, extra pillow or extra mattress. The current course of treatment appears to be continued use of the TENS unit along with medication. In short, the undisputed facts show that defendant Sumnicht *is* treating plaintiff for his head, neck and back pain, albeit not with the particular treatment plaintiff desires. At this point in the proceedings, nothing in the record, such as expert testimony, suggests that Sumnicht's treatment decisions were a "substantial departure from accepted professional judgment,

20

practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment."  Id.  Thus, plaintiff has failed to show some likelihood of success on the merits of his claims.  Accordingly, I will deny his motion for preliminary injunctive relief.

MOTION TO REVOKE IMMINENT DANGER STATUS

In the May 20, 2010 screening order, I warned plaintiff that his ability to proceed in forma pauperis may be revoked if it became clear that he has exaggerated or fabricated an emergency to circumvent the three strikes bar.  In their brief opposing plaintiff's motion for summary judgment, defendants argue that the court should revoke plaintiff's imminent danger status because he "has submitted a brief and proposed findings of fact that deliberately misrepresent his medical history, the treatment he has received in the past, and WCI/HSU's current response to his medical needs."  Although I agree that plaintiff has misrepresented much of his medical history, I conclude that it would be premature to revoke plaintiff's imminent danger status.  The foundation of his claims remains; it is undisputed that plaintiff continues to suffer from back and neck ailments, and that defendants have removed some comfort items from his treatment.  Plaintiff's biggest error in briefing his motion for preliminary injunctive relief is thinking that his current medical providers should be forced to continue treatment options that plaintiff had been receiving, even if the medical staff does not find those options medically necessary.  As the case proceeds to summary

21

judgment proceedings or trial, plaintiff will have to show that defendant Sumnicht's treatment decisions were a "substantial departure from accepted professional judgment, practice, or standards," not just that Sumnicht canceled plaintiff's comfort items such as his lower bunk restriction, extra mattress or extra pillow.  This can be proven by adducing enough evidence to show that a layperson would understand the treatment decisions to be a substantial departure from accepted professional judgment (which in this case is unlikely), or by presenting expert testimony fulfilling this standard.


## MOTION FOR RULE 35 EXAMINATION

Plaintiff has filed a motion for an independent medical examination under Fed. R. Civ. P. 35.  Plaintiff is mistaken about the way Rule 35 works.  Under this rule, the court could order the plaintiff to submit to an examination at the request of an opposing party. The rule is not intended to cover a situation such as the one here, in which plaintiff wishes an examination of himself.  Obtaining evidence to prove his case is plaintiff's responsibility, not the defendants'.   Accordingly, I will deny this motion.


## MOTION FOR APPOINTMENT OF COUNSEL

Plaintiff has filed a second motion for appointment of counsel.  In deciding whether to appoint counsel, I must first find either that plaintiff has made reasonable efforts to find

a lawyer on his own and has been unsuccessful or that he has been prevented from making such efforts. Jackson v. County of McLean, 953 F.2d 1070 (7th Cir. 1992). To show that he has made reasonable efforts to find a lawyer, plaintiff must give the court the names and addresses of lawyers who he has asked to represent him in this case and who turned him down. Plaintiff has provided a list of two lawyers who turned him down. Although the court usually requires a plaintiff to provide the names of three lawyers who have turned him down, it is unnecessary to determine whether plaintiff has made reasonable efforts to find a lawyer, because he does not require appointment of counsel.

In resolving a motion for appointment of counsel, a district court must consider both the complexity of the case and the ability of the pro se plaintiff to litigate it himself. Pruitt v. Mote, 503 F.3d 647, 654-55 (7th Cir. 2007). As I stated in denying plaintiff's first motion for appointment of counsel, plaintiff is an able litigant in federal court proceedings. He has been a plaintiff in several cases filed in this court and in the Eastern District of Wisconsin. He appears to be familiar with the law relating to prison litigation, as well as the technical aspects of prosecuting a lawsuit, such as conducting discovery, collecting admissible evidence and following court procedures. In one of his other motions, plaintiff explains that he is limited by being given only 30 minutes at a time to review his medical records. In and of itself, this limitation is not a reason to appoint counsel; rather, it may be that plaintiff needs more time to perform the tasks involved in litigation. If plaintiff finds himself limited

23

by this restriction, he is free to file a motion for extension of time so that he has enough time to meet the court's deadlines.  However, his motion for appointment of counsel will be denied.

MOTION FOR INTERLOCUTORY APPEAL

Plaintiff has submitted a document titled "Motion for an Interlocutory Appeal," in which he states that if his second motion for appointment of counsel is denied, he wishes to pursue an interlocutory appeal of the May 27, 2010 order denying his first motion for appointment of counsel.  I construe this document as a notice of appeal and understand plaintiff to be asking for certification of interlocutory appeal under 28 U.S.C. §1292(b), to be taken from the May 21, 2009 order.

28 U.S.C. § 1292 states in relevant part,

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

There is not a substantial ground for a difference of opinion on the question of whether plaintiff is entitled to appointment of counsel in this case.  Moreover, an immediate appeal will not materially advance the ultimate termination of this litigation.  It would serve only

24

to delay it. Therefore, I will deny plaintiff's request to certify that he can take an interlocutory appeal from the May 27, 2010 order denying his motion for appointment of counsel.

Nevertheless, plaintiff's filing of a notice of appeal triggers a financial obligation: he owes the $455 fee for filing his notice of appeal. I will construe his notice of appeal as including a request to proceed in forma pauperis on appeal. A district court has authority to deny a request for leave to proceed in forma pauperis under 28 U.S.C. § 1915 for one or more of the following reasons: the litigant wishing to take an appeal has not established indigence, the appeal is in bad faith or the litigant is a prisoner and has three strikes. § 1915(a)(1),(3) and (g). Sperow v. Melvin, 153 F.3d 780, 781 (7th Cir. 1998). As discussed in the May 20, 2010 order in this case, plaintiff has accrued three strikes for filing frivolous claims. In addition, I certify that the appeal is not taken in good faith because there is no substantial ground for a difference of opinion on the question whether plaintiff is entitled to appointment of counsel in this case.

Because I am certifying plaintiff's appeal as not having been taken in good faith, he cannot proceed with his appeal without prepaying the $455 filing fee unless the court of appeals gives him permission to do so. Under Fed. R. App. P. 24, he has 30 days from the date of this order in which to ask the court of appeals to review this court's denial of leave to proceed in forma pauperis on appeal. With his motion, he must include an affidavit as

25

described in the first paragraph of Fed. R. App. P. 24(a), with a statement of issues he intends to argue on appeal.  Also, he must send along a copy of this order.  Plaintiff should be aware that he must file these documents in addition to the notice of appeal he has filed previously.  If he does not file a motion requesting review of this order, the court of appeals might choose not to address the denial of leave to proceed in forma pauperis on appeal. Instead, it might require him to pay the entire $455 filing fee before it considers his appeal. If he does not pay the fee within the deadline set, it is possible that the court of appeals will dismiss the appeal.


ORDER

IT IS ORDERED that

1.  Plaintiff Larry J. Brown's motion for an extension of time to file materials in reply concerning his motion for preliminary injunctive relief, dkt. #32, is DENIED.

2.  Plaintiff's motion for preliminary injunctive relief, dkt. #14, is DENIED.

3.  Defendants' motion to revoke plaintiff's imminent danger status, dkt. #21, is DENIED.

4.  Plaintiff's motion for a court-ordered medical examination under Fed. R. Civ. P. 35, dkt. #26, is DENIED.

3.  Plaintiff's second motion for appointment of counsel, dkt. #17, is DENIED.

26

4.  Plaintiff's motion for the court to certify that an interlocutory appeal may be taken from the May 27, 2010 order in this case, dkt. #27, is DENIED.

5.   Plaintiff's request for leave to proceed in forma pauperis on appeal, dkt. #27, is DENIED.  The clerk of court is directed to insure that plaintiff's obligation to pay the $455 fee for filing his appeal is reflected in the court's financial records.

Entered this 15th day of September, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

27